IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | |
|---|---|
| Frank Ellis, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| Deputy Devig, individually and as | ) |
| LaMoure County Deputy; Sheriff Jensen, | ) |
| individually and as LaMoure County | ) |
| Deputy; Officer Mattice, individually and | ) |
| as Jamestown S.O.T. Unit Officer; | ) |
| Corporal Edinger, individually and as | ) |
| Jamestown S.O.T. Unit Officer; City of | ) |
| Jamestown, North Dakota, a municipal | ) |
| corporation; and LaMoure County, North | ) |
| Dakota, a political subdivision, | ) |
| | ) |
| Defendants. | ) |

**ORDER ON MOTION FOR
SUMMARY JUDGMENT**

Civil No. 3:08-cv-19

Before the Court is a Motion for Summary Judgment filed by Defendants Deputy Bradley Devig, Sheriff Gary Jensen, Officer Alan Mattice, Corporal Scott Edinger, the City of Jamestown, and LaMoure County (Doc. #28).  Plaintiff Frank Ellis has filed a brief in opposition (Doc. #36). The Court has carefully considered the briefs and documents filed by the parties and now issues this memorandum opinion and order.

## SUMMARY OF DECISION

The Court concludes there are genuine issues of material fact which must be resolved by a jury on the 42 U.S.C. § 1983 excessive force claim asserted against the officers in their individual capacities in Count One, as well as the assault and battery claim against the officers in Count Two, and therefore the Motion for Summary Judgment on those claims is DENIED.  However, the Court

also concludes there is no evidence of any official policy or widespread custom to support a claim

for municipal liability under 42 U.S.C. § 1983, and therefore the Motion for Summary Judgment is

GRANTED as to the claims against the officers in their official capacities in Count One, LaMoure

County in Count Three, and the City of Jamestown in Count Four.

## FACTUAL BACKGROUND

The instant action arises out of a domestic disturbance and the subsequent arrest of Plaintiff

Frank Ellis at his home in rural LaMoure County, North Dakota, on August 23, 2006.  The Court

will not recount in full detail the facts leading up to and subsequent to Ellis's arrest, because to the

extent those facts are disputed, they are not material to the resolution of this summary judgment

motion.

On the evening of August 22, 2006, Ellis went to a local bar after work and consumed

alcoholic beverages until closing time.  When he left the bar at approximately 1:00 a.m., now in the

early morning hours of August 23, he continued drinking alcoholic beverages as he drove on back

roads, first driving home but then leaving without going inside, then driving to his mother's house

and finding it locked.  Ellis eventually returned to the home he shared with his wife, Cheryl Ellis,

arriving at approximately 3:20 a.m.

The parties are not in complete agreement about what happened when Ellis entered his home

and encountered Cheryl, who was asleep in their bed.  However, the parties agree that a domestic

disturbance occurred that night, and certain facts appear to be undisputed.  Ellis was intoxicated,

angry, and "in an enraged state" over Cheryl's intention to seek a divorce.  Frank Ellis Dep. at 63-

64, 73, Sept. 25, 2008.  When he saw Cheryl in their bedroom, he screamed and yelled at her to "get

the f--- out" of the house.  Ellis concedes that he had some physical contact with his wife at that

2

point, grabbing her arms to lift her up out of the bed.  In her affidavit, Cheryl describes the incident

as involving more physical contact and significantly more intimidation on the part of Ellis, but the

Court need not resolve that dispute here.  As Ellis continued screaming at her to "get the f---- out,"

Cheryl called 911, but the call was terminated before she spoke to any operators.  According to

Cheryl, Ellis ripped the phone out of the wall to end her call, but Ellis claims that Cheryl dropped

the phone on her way out of the house.  Cheryl eventually fled the house wearing only her nightshirt

and underwear.

Deputy Bradley Devig and Officer Stacy Devig were dispatched to the Ellis home because

of the hung-up 911 call.  When they arrived, they knocked on the door and announced themselves

as law enforcement but received no response and saw no movement.  In the meantime, Cheryl had

called 911 again to report that she was no longer at her own home, but that she had gone to her

sister's house several blocks away.  Deputy Devig and Officer Devig left the Ellis residence and

went to Cheryl's sister's house to speak with her.  Cheryl reported the domestic incident to the

officers, informing them that she had never before seen Ellis like that, that they should be careful

because she was unsure what he would do, and that there was an unlocked gun cabinet in their

bedroom where the incident had occurred.

Deputy Devig and Officer Devig then returned to a gravel road nearby the Ellis residence

and waited for back up to arrive.  Several other officers eventually joined them on the scene,

including Sheriff Gary Jensen.  According to Deputy Devig, he was looking at the house through

binoculars from the gravel road and saw a light switch on for twenty seconds and a figure in the

window, which he relayed to the other officers.  Bradley Devig Dep. at 26, Sept. 24, 2008.

However, none of the other officers on the scene at that time reported seeing any movement, and

Ellis testified that he was "positive" he did not turn on the light. Ellis Dep. at 87. As the officers were gathered outside Ellis's house, they made various attempts to contact him, including by telephone and with a PA system and sirens. Officer Devig and another officer briefly left the scene to speak with Cheryl again, this time obtaining a hand-drawn map of the interior of the house, as well as keys to the residence, which Officer Devig gave to Sheriff Jensen upon their return.

At approximately 5:00 a.m., Deputy Devig called the Jamestown Police Department at the direction of Sheriff Jensen and requested assistance from the Special Operations Team ("SOT"). While the officers on the scene were waiting outside the home, they continued to attempt contact with Ellis through the PA system and sirens. At approximately 7:00 a.m., seven SOT officers, including Corporal Scott Edinger and Officer Alan Mattice, arrived at a location about two miles from the Ellis residence. Sheriff Jensen met the SOT unit there and gave the keys to the residence to one of the SOT officers.

After meeting with Sheriff Jensen, the SOT officers drove to the Ellis home, set up a perimeter around the area, and then began formulating a plan for forced entry. SOT Officer Russ Shahin reported seeing a round-shaped glint of light "much like a rifle scope or eyeglasses" moving in an open window, and he reported that to the other officers around him. Russ Shahin Dep. at 16-17, Sept. 24, 2008. None of the other officers on the scene reported seeing any movement.

At about 9:30 a.m., the officers received an arrest warrant for Ellis and a search warrant for his home to look for evidence of interference with a 911 call. In light of the issuance of the warrants, the SOT unit decided to execute their entry plan to arrest Ellis. The officers announced over the PA system that they had warrants and that Ellis needed to come out. When there was no response, SOT Officers Russ Shahin and Robert Schlenvogt launched several rounds of chemical

munitions into different areas of the house.  As Officers Shahin and Schlenvogt were walking around the house and deploying the chemicals, they made contact with Ellis, who had opened a basement egress window and was leaning out.  According to Officer Schlenvogt, he ordered Ellis "to come out, show us his hands, don't move," but Ellis was noncompliant and kept raising and lowering his hands.  Robert Schlenvogt Dep. at 17, 23-24, Sept. 24, 2008.  Officer Shahin reported that he was also yelling commands at Ellis to "put up his hands and don't move," but Ellis was noncompliant.  Shahin Dep. at 23-24.  Both officers also reported that Ellis was angry and kept asking "what's going on."

After Officers Shahin and Schlenvogt had already made contact with Ellis through the basement window, Corporal Edinger ordered the rest of the team to execute a forced entry into the house.  The SOT officers attempted to kick in the door but were unsuccessful, so they used a battering ram to gain entry to the house.  Alan Mattice Dep. at 16, Sept. 24, 2008.  They found Ellis located in the basement, wearing a t-shirt and underwear.  According to the officers, they yelled at Ellis to raise his hands and stop moving, but he was resistant and noncompliant.  Mattice Dep. at 18-22.  Officer Mattice reported that he tasered Ellis in the torso because of his noncompliance, but the taser misfired and was unsuccessful in subduing Ellis.  Mattice Dep. at 22.  Corporal Edinger, who was standing outside the open basement window, fired multiple rounds of a pepper ball system at Ellis, hitting him numerous times.  According to the officers on the scene, Officer Mattice then deployed the taser a second time, hitting Ellis in the back.  Ellis received a full five-second shock and fell to the ground.  Several of the officers testified that Ellis made a statement to the effect of "I'm done."  Ellis was then handcuffed, frisked, and taken into custody.

5

Perhaps unsurprisingly in a case of this nature, Ellis's account of what happened during the incident differs in some material respects from the accounts of the officers.  In his deposition testimony, Ellis stated that he did not hear sirens going off, or attempts by the officers to contact him using an intercom system or with telephone calls, because he was passed out on the basement couch. Ellis Dep. 88-89, 95-96.  He woke up when it sounded like a bomb went off in the house.  Ellis Dep. 98.  He heard shattering glass and saw a chemical munition lying right beside the couch emitting orange smoke.  Id.  Ellis kicked the munition into the bathroom and closed the door, in an effort to contain the chemical.  Ellis Dep. 100.  He then noticed legs walking by the garden-level window of his house and looked outside.  Ellis Dep. 101.  He was "stunned" to see police officers wearing riot gear who "looked like they were army."  Id.

According to Ellis, the officers on the scene were yelling several different commands at him. Ellis Dep. at 102.  He was confused because one was yelling get down, and one was yelling hands up.  Id.  Ellis concedes that he could have been yelling profanities at the officers at that time, but he does not recall.  Ellis Dep. at 103.  He then heard "a big thunder" coming down the stairs, turned to see what was going on, and got shot in the chest with a taser.  Ellis Dep. at 103-04.  However, the taser did not deploy properly, and he plucked it out of his chest.  Ellis Dep. at 104.  He was suddenly hit again, by what he later learned was pepper shot, although at the time he did not know whether they were real bullets.  Id.  The officers then grabbed him, threw him on the floor face down, cuffed him, stuck a bar between his arms, and then shot him in the buttocks with a taser for approximately five seconds.  Ellis Dep. at 104, 109.  Ellis was screaming at them to stop.  Ellis Dep. at 105.

Ellis further testified that as a result of the force used by the officers, he had multiple wounds from pepper shot on his torso and elbows, as well as a bruise on his side.  Ellis Dep. at 108.  His

elbows were "busted open." Ellis Dep. at 108-09. He was bleeding and also had a "big hole" worn in his wrists from the handcuffs and the manner in which Deputy Devig twisted his arms. Ellis Dep. at 110. After Ellis's arrest, Officer Shahin went to the correctional facility where he was being held to photograph any resulting injuries on his body. Officer Shahin observed welts from the pepper balls, but did not find the probe sites from the taser deployment. Shahin Dep. at 29.

As a result of the incident, Ellis faced several state criminal charges and ultimately pleaded guilty to menacing, interference with an emergency call, and violation of a protection order. On February 11, 2008, Ellis filed this suit against Deputy Bradley Devig, Sheriff Gary Jensen, Officer Alan Mattice, and Corporal Scott Edinger, in both their individual and official capacities (collectively, "the officers"). Ellis also filed suit against LaMoure County and the City of Jamestown. In his Complaint, Ellis essentially alleges three causes of action against the Defendants. In Count One, he asserts a claim against the officers under 42 U.S.C. § 1983, alleging that they used excessive force during his arrest in violation of the Fourth Amendment. In Count Two, he alleges that the officers committed assault and battery against him during the arrest in violation of state law. In Counts Three and Four, Ellis asserts a claim against LaMoure County and the City of Jamestown under 42 U.S.C. § 1983, alleging that they developed and maintained policies or customs exhibiting deliberate indifference to constitutional rights. In his demand for relief, Ellis seeks compensatory damages in excess of $75,000.00, as well as costs, interest, and attorney's fees.

Defendants have now moved for summary judgment as to all of Ellis's claims, arguing that there are no genuine issues of material fact and that judgment is appropriate as a matter of law. In opposition, Ellis contends that there are numerous issues of material fact in this case, and therefore all of his claims must be allowed to proceed to trial.

# DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The burden is on the moving party to establish the basis for its motion.  <u>Donovan v. Harrah's Md. Heights Corp.</u>, 289 F.3d 527, 529 (8th Cir. 2002).  It is axiomatic that the evidence is viewed in a light most favorable to the nonmoving party, and the nonmoving party enjoys the benefit of all reasonable inferences to be drawn from the facts.  <u>See, e.g.</u>, <u>Vacca v. Viacom Broad. of Mo., Inc.</u>, 875 F.2d 1337, 1339 (8th Cir. 1989) (quotations omitted); <u>see also</u> <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (noting that in qualified immunity cases, the summary judgment standard usually means adopting the plaintiff's version of the facts).  If the moving party shows there are no genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing a genuine issue for trial.  <u>Donovan</u>, 298 F.3d at 529.

A fact is "material" if it might affect the outcome of the case, and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  The basic inquiry is whether the evidence presents a sufficient disagreement to require full consideration on the merits by a jury, or whether it is so one-sided that one party must prevail as a matter of law.  <u>Diesel Mach., Inc. v. B.R. Lee Indus.</u>, 418 F.3d 820, 832 (8th Cir. 2005).  When the unresolved issues in a case are primarily legal rather than factual, summary judgment is particularly appropriate.  <u>Mansker v. TMG Life Ins. Co.</u>, 54 F.3d 1322, 1326 (8th Cir. 1995).  However, although summary judgment may be an appropriate and useful tool to avoid useless and time-consuming trials, "[it] should not be granted

unless the moving party has established the right to a judgment with such clarity as to leave no room

for controversy." <u>Vacca</u>, 875 F.2d at 1339 (citations omitted).

### I.  42 U.S.C. § 1983 Claim Against the Officers in Their Individual Capacities

In Count One, Ellis alleges that the conduct of the individual officers during his arrest

constituted an unreasonable seizure in violation of the Fourth Amendment.  Specifically, Ellis

alleges that the officers used excessive force to arrest him and thereby caused him to suffer physical

pain and suffering and emotional trauma.  The officers have moved for summary judgment on the

excessive force claim against them in their individual capacities, arguing that they are entitled to

qualified immunity because their conduct was objectively reasonable as a matter of law.  Ellis

opposes the motion, contending that there are genuine issues of material fact in this case which must

be resolved by a jury.

Section 1983, Title 42 U.S.C., provides a cause of action against government officials who

deprive other persons of "rights, privileges, or immunities secured by the Constitution."  <u>Hayek v.</u>

<u>City of St. Paul</u>, 488 F.3d 1049, 1054 (8th Cir. 2007) (quoting 42 U.S.C. § 1983).  However,

government officials are entitled to dismissal of such actions under the doctrine of qualified

immunity "if their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  <u>Hassan v. City of Minneapolis, Minn.</u>, 489 F.3d

914, 919 (8th Cir. 2007).  Qualified immunity is not just a defense to liability; it constitutes

immunity from suit.  <u>Hayek</u>, 488 F.3d at 1054.

Courts apply a two-part analysis to determine whether an official is entitled to qualified

immunity.  <u>Samuelson v. City of New Ulm</u>, 455 F.3d 871, 875 (8th Cir. 2006).  The threshold

inquiry is "whether the facts alleged, taken in the light most favorable to the injured party, show that

the officer's conduct violated a constitutional right." Ngo v. Storlie, 495 F.3d 597, 602 (8th Cir. 2007) (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). If the officer has violated a constitutional right, the court must then determine "whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted." Moore v. Indehar, 514 F.3d 756, 759 (8th Cir. 2008) (citing Saucier, 533 U.S. at 202). The second step of the analysis is fact-intensive and "must be undertaken in light of the specific context of the case, not as a broad general proposition." Samuelson, 455 F.3d at 875 (quoting Saucier, 533 U.S. at 201).

### A. Whether the Officers Violated a Constitutional Right

Here, Ellis contends that the officers violated his constitutional right to be free from excessive and unreasonable force during the course of his arrest. It is well established that claims of excessive force related to arrests are analyzed under the Fourth Amendment's objective reasonableness standard. See Hassan, 489 F.3d at 919; Ngo, 495 F.3d at 602 (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). The relevant inquiry is whether the amount of force used was objectively reasonable under the particular facts and circumstances of the case, without regard to the underlying intent or motivation of the officers. Hayek, 488 F.3d at 1054 (quotations omitted); Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006) (quotations omitted).

In assessing the reasonableness of an officer's conduct, courts must carefully examine the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Samuelson, 455 F.3d at 875 (quoting Graham, 490 U.S. at 396); see also Ngo, 495 F.3d at 602. In addition to considering the facts and circumstances

surrounding an officer's use of force, courts may also consider the result of that force, namely, the extent of any resulting injuries. See Littrell v. Franklin, 388 F.3d 578, 583 (8th Cir. 2004). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." Gill v. Maciejewski, 546 F.3d 557, 562 (8th Cir. 2008) (quoting Graham, 490 U.S. at 396-97). "Whether an officer's use of force is reasonable is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Moore, 514 F.3d at 762 (citing Graham, 490 U.S. at 396).

After carefully examining the record in the light most favorable to Ellis, and giving him the benefit of all reasonable inferences to be drawn from the facts, the Court concludes there are genuine issues of material fact surrounding the circumstances of his arrest such that a reasonable jury could find the degree of force used by the officers was objectively unreasonable.[1]  Certain facts which are relevant to the reasonableness inquiry are undisputed, namely, that the underlying crime was a domestic disturbance; that Cheryl Ellis had been out of the house and out of immediate danger since approximately 3:30 a.m.; that law enforcement had received information from Cheryl Ellis that her husband was intoxicated, angry, and in a state she had never seen him before, and he had access to guns in their bedroom; and that the officers first received the domestic disturbance call at 3:20 a.m. but did not employ the SOT unit to effect his arrest until approximately 10:00 a.m., almost seven hours later.  When viewed in the light most favorable to Ellis, several of these undisputed facts may support the conclusion that the officers used an unreasonable amount of force, as the situation was

---

[1] The Court notes that the officers clearly had legal authority to arrest Ellis based upon the arrest warrant issued by a state judge, as well as the existence of probable cause to believe he had committed an act of domestic violence in violation of North Dakota law.  The question presented here is whether the force used to effect that arrest was excessive and unreasonable.

not rapidly evolving, nor did it call for many split-second judgments on the part of law enforcement, and Ellis's wife was not in any immediate danger once she had fled from the house.

In addition to the inferences from these undisputed facts, there are several disputed facts which, if resolved by a jury in Ellis's favor, could support a finding that the officers used an unreasonable and excessive amount of force in the course of his arrest.  In his deposition, Deputy Devig testified that he saw a light go on in the house for about twenty seconds while he was observing the residence from the gravel road.  Similarly, Officer Shahin testified that he saw a glint in an open window like a rifle scope or eyeglasses, which indicated movement inside the house.  However, none of the other officers can corroborate that these movements occurred, and Ellis denies that he ever turned on a light or otherwise moved within the house, maintaining that he was passed out and completely unaware of the presence of the officers.  The Court finds these factual disputes are material to the reasonableness of the officers' conduct.  In his deposition testimony, Corporal Edinger cited these two movements as critical to his tactical decisions in command of the SOT unit.  Scott Edinger Dep. at 32, Sept. 24, 2008.  If these movements occurred, it may have been reasonable for the officers to believe that Ellis was barricaded inside the house.  Without these two movements, a reasonable jury could find that the officers had no real reason to believe that this was a "stand off" situation that required use of chemical munitions and forced entry into the home.

Furthermore, the record also contains a material factual dispute regarding whether Ellis actually resisted arrest or was noncompliant with the commands of the officers.  According to Ellis, the officers were yelling inconsistent commands at him, as some told him to put his hands up, while others told him to get down.  The Court notes that even the officers' own testimony about what they

told Ellis to do is not entirely consistent, and a reasonable jury could infer that they were telling Ellis to take inconsistent actions at the same time, such as "stay put" and "come out."

There is also a material factual dispute regarding the amount of force used upon Ellis, specifically, the exact moment when he was tasered for the second time. According to the officers, Ellis was tasered a second time because of his noncompliance, and he was placed in handcuffs after he went down due to the force of the taser. On the other hand, Ellis claims that the officers tasered him in the buttocks after he was already handcuffed and lying face down on the floor. Because there appears to be no medical or photographic evidence indicating exactly where Ellis was tasered, the parties' differing version of events ultimately boils down to a credibility determination, which must be made by the finder of fact at trial rather than on a motion for summary judgment.

Finally, the Court is not persuaded by the officers' argument that they are entitled to judgment as a matter of law because Ellis's injuries are de minimus. Although the Eighth Circuit Court of Appeals has held that "a de minimus use of force or injury is insufficient to support a finding of a constitutional violation," see Crumley v. City of St. Paul, Minn., 324 F.3d 1003, 1007 (8th Cir. 2003), it has also recognized that "[i]t remains an open question in this circuit whether an excessive force claim requires some minimum level of injury." Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005) (quoting Hunter v. Namanny, 219 F.3d 825, 831 (8th Cir. 2000)). Based on all the facts of this case, the Court is not convinced that Ellis's injuries are too minor to support an excessive force claim as a matter of law. Rather, the Court concludes it is more appropriate for the finder of fact to consider the nature and degree of Ellis's injuries as part of the totality of the circumstances in determining whether the officers used unreasonable and excessive force. See Mann v. Yarnell, 497 F.3d 822, 826 (8th Cir. 2007) (stating that courts "may also evaluate the extent

13

of the suspect's injuries" when considering all the facts and circumstances of an excessive force case).

For all the foregoing reasons, the Court concludes a reasonable jury could find that the conduct of the officers in arresting Ellis was not objectively reasonable, and therefore they violated his constitutional right to be free from excessive force.  Because the record does not conclusively establish the reasonableness of the officers' conduct as a matter of law, their Motion for Summary Judgment on that basis must be denied.

### B.  Whether That Right Was Clearly Established

In the second step of the qualified immunity analysis, the Court must consider whether Ellis's right to be free from excessive force was clearly established.  See Moore, 514 F.3d at 763. "The dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Ngo, 495 F.3d at 602 (quoting Saucier, 533 U.S. at 202).  An officer asserting qualified immunity must demonstrate that he acted reasonably under settled law in the circumstances.  Id. at 604 (quotations omitted).  In other words, if an officer made a reasonable mistake as to what conduct the law required, he is entitled to the immunity defense.  Id. (citing Saucier, 533 U.S. at 205); Samuelson, 455 F.3d at 876.  However, an officer will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that he should take the disputed action. Samuelson, 455 F.3d at 876-77 (quotations omitted).  Therefore, the qualified immunity defense operates to ensure that before officers are subject to suit, they are on notice that their conduct is unlawful, thus protecting them from the sometimes "hazy border between excessive and acceptable force."  Id. at 877 (quoting Saucier, 533 U.S. at 206).

The issue of qualified immunity is ultimately a question of law for the court, rather than the jury, to decide.  Littrell, 388 F.3d at 584.  However, the legal question of qualified immunity is frequently intertwined with unresolved factual questions which prevent a court from ruling on the issue of qualified immunity prior to trial.  See id. at 585.  "[W]here questions of historical fact exist, the jury must resolve those questions so that the court may make the ultimate legal determination of whether officers' actions were objectively reasonable in light of clearly established law."  Id. at 586.  Thus, an officer moving for summary judgment on the basis of qualified immunity "must demonstrate that no material issues of fact remain as to whether [his] actions were objectively reasonable in light of the law and the information [he] possessed at the time of his actions."  Henderson, 439 F.3d at 503.

As the Court explained at length in the previous section, there are numerous unresolved factual questions in this case which preclude a determination on the qualified immunity issue prior to trial.  Just as there are genuine issues of material fact regarding the objective reasonableness of the officers' conduct, there are also genuine issues of material fact regarding whether reasonable officers in the same position would have known that their conduct violated Ellis's right to be free from excessive force.  Because the factual disputes on the first prong of the qualified immunity test are inextricably intertwined with the analysis on the second prong, the Court concludes that the Motion for Summary Judgment on Count One on the basis of qualified immunity must be in all respects DENIED.

## II.  Assault and Battery Claim Against the Officers in Their Official and Individual Capacities

In Count Two, Ellis asserts a tort claim against the officers in their official and individual capacities for assault and battery under North Dakota law.  The officers have moved for summary

15

judgment, arguing primarily that they are entitled to discretionary immunity from suit under N.D.C.C. § 32-12.1-03(3)(d).[2]

The parties have given short shrift to the assault and battery claim in their briefing, perhaps recognizing that it presents factual issues similar to those presented in the § 1983 excessive force claim, so the Court will not engage in a lengthy analysis here.  For the same reasons set forth in the preceding section, the Court finds there are genuine issues of material fact regarding the circumstances of Ellis's arrest that preclude granting summary judgment on the assault and battery claim.  See Kautzman v. McDonald, 2001 ND 20, ¶ 8, 621 N.W.2d 871, 874 ("Acts of gross negligence and willful or wanton misconduct can render a state or county employee personally liable."); see also N.D.C.C. § 32-12.1-03(1) ("Each political subdivision is liable for money damages for injuries when the injuries are proximately caused by the negligence or wrongful act or omission of any employee acting within the scope of the employee's employment or office under circumstances where the employee would be personally liable to a claimant in accordance with the laws of this state . . . .").

Furthermore, the Court also concludes that the discretionary immunity defense asserted by the officers clearly does not apply to the facts of this case.  Under N.D.C.C. § 32-12.1-03(3), a political subdivision is exempt from liability for an act or omission of its employees who are performing discretionary functions or duties.  Kautzman, 2001 ND 20, ¶ 30, 621 N.W.2d at 879.  When determining the applicability of the discretionary function exception, courts must engage in

---

[2] The Court notes that the officers have briefly addressed other purported state law claims for negligence, illegal arrest, and unlawful imprisonment.  Although Ellis used each of these terms in the first paragraph of his Complaint, the facts he has pleaded do not support such claims, nor has he alleged a separate cause of action for any of these claims.  Because the Court concludes that Ellis has not actually asserted these additional state law claims in this action, it will not address the officers' arguments in that regard.

a two-part analysis: (1) whether the conduct at issue is discretionary, involving an element of judgment or choice for the acting employee; and (2) if the act is discretionary, whether that judgment or choice is of the kind the discretionary function exception was designed to shield. Id. The primary focus of the second part of the test is on the nature of the actions taken and whether they are susceptible to policy analysis. Peterson v. Traill County, 1999 ND 197, ¶ 13, 601 N.W.2d 268, 273. The North Dakota Supreme Court has stated that "[t]he purpose of the discretionary function exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." Olson v. City of Garrison, 539 N.W.2d 663, 667-68 (N.D. 1995) (internal quotations omitted). Discretionary function immunity does not operate to shield ordinary individualized decisions made by law enforcement officers as part of their routine work duties. See Kautzman, 2001 ND 20, ¶ 32, 621 N.W.2d at 879.

Here, the decisions that the officers made in the course of arresting Ellis did not implicate social, economic, or political public policy considerations. Rather, this case involves merely ordinary, individualized judgments made by law enforcement officers as they carried out their routine work duties, and therefore the discretionary function exception does not apply. Because there are genuine issues of material fact on the assault and battery claim, and the officers' asserted discretionary immunity defense fails as a matter of law, the Motion for Summary Judgment on Count Two is DENIED.

### III.  42 U.S.C. § 1983 Claim Against the Officers in Their Official Capacities, LaMoure County, and the City of Jamestown

Finally, Ellis has also asserted his § 1983 excessive force claim against the officers in their official capacities in Count One, against LaMoure County in Count Three, and against the City of

Jamestown in Count Four.  In Counts Three and Four, Ellis specifically alleges that LaMoure County and the City of Jamestown developed and maintained policies or customs exhibiting deliberate indifference to constitutional rights, including inadequate supervision and training of officers.  All Defendants have moved for summary judgment, arguing there is no evidence of any such institutional policies or customs.

A suit against a government official in his official capacity is actually a suit against the entity for which the official is an agent.  Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006); see also Baker v. Chisom, 501 F.3d 920, 925 (8th Cir. 2007) (quoting Hafer v. Melo, 502 U.S. 21, 25 (1991)) ("[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official.").  A municipality or other local government cannot be held liable on a respondeat superior theory, so the plaintiff pursuing such an action must prove that the municipality itself caused the constitutional violation at issue.  Elder-Keep, 460 F.3d at 986.  In other words, to establish municipal liability, the plaintiff must show that an official policy or widespread custom resulted in his injuries.  Mann v. Yarnell, 497 F.3d 822, 827-28 (8th Cir. 2007); Elder-Keep, 460 F.3d at 986.  "Proof of a single incident of unconstitutional activity is not sufficient to impose liability . . . unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  Mann, 497 F.3d at 828 (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985)).

After carefully reviewing the record, the Court concludes there is no competent evidence of any official policy in LaMoure County or the City of Jamestown, nor a widespread custom engaged in by the employees of those entities, that resulted in the alleged violation of Ellis's Fourth Amendment right to be free from excessive force.  Rather, Ellis has presented only conclusory

18

allegations of inadequate training and widespread custom in an expert affidavit, see Aff. of Ed Tatosian ¶¶ 24-25,[3] the fact that he heard "complaints" about these entities from other people, see Ellis Dep. at 142, and his belief that another lawsuit was previously filed against the sheriff's department.  See Ellis Dep. at 143.  Ellis has essentially presented evidence regarding a single incident of allegedly unconstitutional activity, and then attempted to bootstrap that incident into proof of an official policy or widespread custom.  On this record, the Court finds that no reasonable jury could return a verdict for Ellis on his municipal liability claim against any of the Defendants, and therefore the Motion for Summary Judgment on that claim is GRANTED.

## DECISION

The Motion for Summary Judgment is **GRANTED** as to the 42 U.S.C. § 1983 claim against the officers in their official capacities, LaMoure County, and the City of Jamestown, as set forth in Counts One, Three, and Four.  The Motion for Summary Judgment is **DENIED** as to the 42 U.S.C. § 1983 claim against the officers in their individual capacities as alleged in Count One, and the assault and battery claim against the officers in Count Two.

**IT IS SO ORDERED.**

Dated this 26th day of June, 2009.

     /s/   Ralph R. Erickson
Ralph R. Erickson, District Judge
United States District Court

---

[3] Defendants have moved to strike these particular paragraphs of Mr. Tatosian's affidavit on the grounds that they were not in the previously disclosed expert report, but the Court concludes that it need not resolve the issue because the municipal liability claims cannot survive the motion for summary judgment in any event.  The Court also notes that Mr. Tatosian's expert testimony and expert report are the subject of a recently filed Motion in Limine that will need to be resolved by the time of trial (Doc. #48).